UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
SEAN PINNICK,                           )
                                        )
            Plaintiff,                   )
                                        )
v.                                      )          Civil Action No. 14-12887-LTS
                                        )
CAROLYN COLVIN, Acting                  )
Commissioner of the Social              )
Security Administration,                )
                                        )
            Defendant.                   )
_____)

ORDER ON PLAINTIFF'S MOTION TO REVERSE OR REMAND
AND DEFENDANT'S MOTION TO AFFIRM

September 21, 2015

SOROKIN, J.

        Plaintiff, Sean Pinnick ("Pinnick"), seeks reversal of the decision made by Defendant

Carolyn Colvin, the Acting Commissioner of Social Security ("the Commissioner"), denying

Pinnick's claims for Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI") benefits.  The Commissioner, in turn, seeks an order affirming her decision.  Doc. Nos.

18, 26.

        For the reasons set forth below, Pinnick's Motion to Reverse the Commissioner's

decision is DENIED, and the Commissioner's Motion to Affirm her decision is ALLOWED.

I.      BACKGROUND

    A.      Procedural History

    Pinnick applied for DIB and SSI on April 7, 2011.  A.R. at 192-207.[1]  Pinnick stated he

was suffering from two slipped discs, a pinched nerve, and severe arthritis flare-ups.  A.R. at

227.  Pinnick initially claimed the onset date of his disability was June 30, 2008 but later

amended the date to September 1, 2011.  A.R. at 80, 181, 221-22.  On November 7, 2011,

Pinnick's claims for DIB and SSI benefits were denied on initial review.  See A.R. at 109-21.

On December 1, 2011, Pinnick filed a disability report where he added the following physical

conditions to those listed in his initial disability report: hypertension, gastroesophageal reflux

disease, chronic back pain, and sciatica.  A.R. at 246.  Pinnick then submitted a request for

reconsideration which was received by the Social Security Administration District Office on

December 21, 2011.  A.R. at 122-23.  On March 29, 2012, Pinnick's claims were denied on

reconsideration.  A.R. at 124-29.  On August 2, 2012, Pinnick requested a hearing by an

administrative law judge ("ALJ").  A.R. at 130.  An ALJ first denied Pinnick's request for a

hearing on August 30, 2012, stating the request was untimely and a written request for an

extension had not been provided explaining good cause for missing the sixty-day deadline.  A.R.

at 74-78, 130-133.  Pinnick requested a review of the ALJ's decision on October 8, 2012 and

alleged that neither he, nor his attorney, had received the notice of denial on reconsideration.

A.R. at 134-39.  On March 11, 2013, the Appeals Council vacated the ALJ's decision, finding

that Pinnick had good cause for missing the filing deadline.  A.R. at 99-102.  A hearing before an

ALJ was held on July 25, 2013 where both Pinnick, represented by counsel, and an impartial

---

[1] Citations to "A.R." are to the administrative record, which appears as document 13 in the docket in this matter.  Page numbers are those assigned by the agency and appear in the lower right-hand corner of each page.

vocational expert testified.  See A.R. at 26-46.  In a written opinion dated August 16, 2013, the

ALJ denied Pinnick's claims for DIB and SSI.  A.R. at 11-23.  On June 18, 2014, the Appeals

Council denied Pinnick's request for review of the ALJ's decision, making it the final decision of

the Commissioner.  A.R. at 1-4.  Pinnick proceeded to file this action for judicial review of the

Commissioner's decision on July 8, 2014.  Doc. No. 1.

B.      Pinnick's History

Pinnick was forty-seven years old on the date of the hearing and worked as a carpenter

for twenty years until 2008 when he suffered a work-related injury after a steel panel dropped on

his foot.  See A.R. at 21, 32-33, 183-84, 192, 199.  As of the date of his hearing, Pinnick was

homeless and attended a day shelter, Bread & Jams.  A.R. at 33.  Pinnick has three adult children

and grandchildren.  See A.R. at 35, 418, 523.  Pinnick's date last insured for the purpose of DIB

is December 31, 2013.[2]  A.R. at 14-16.

C.      Pinnick's Physical Impairments

The administrative record contains the following evidence of Pinnick's physical

impairments.

Pinnick sought treatment for complaints of gout and painful and swollen joints as early as

the spring of 2009.  A.R. at  287.  He appeared in the emergency room complaining of severe

gout pain on November 18, 2010.  A.R. at 391-392.  He again presented in the emergency room

on December 8, 2010 with joint paint and had an aspiration of his knee, which revealed the

presence of crystals in the removed fluid.  A.R. at 399.

Pinnick was examined on December 22, 2010 by Dr. Amy Wasserman, a rheumatologist,

together with Dr. Maureen Dubreuil, a rheumatology fellow, on a referral for polyarthritis.  A.R.

---

[2] There appears to be no dispute between the parties as to Pinnick's date last insured.  A.R. at 180.

at 444-45.  At that time, it was reported that Pinnick had a four-year history of the joint pain and swelling.  A.R. at 444-45.  Pinnick reported that he had been prescribed prednisone at various times for pain and swelling, which improved his symptoms, although they worsened when he discontinued of the drug.  A.R. at 444.  Dr. Wasserman's musculoskeletal examination revealed a full, warm and slightly tender right olecranon bursa with a presence of nodules; slight synovitis in the left third through fourth proximal interphalangeal ("PIP") joints; warm synovitis in the right knee with pain on full flexion and no effusion; swelling, diffuse redness and pain on palpation/flexion in the right first metatarsophalangeal ("MTP") joint; redness, slight swelling and tenderness to palpation in the left metatarsal base; and no visible bone deformity.  A.R. at 444.  There was no active synovitis or pain found in Pinnick's shoulders, left elbow, wrists, hips, left knee, ankles, or other fingers and toes.  A.R. at 444.  Dr. Wasserman recommended prophylaxis with Allopurinol and colchicine to treat Pinnick's gouty arthritis, and counseled avoidance of dietary triggers such as alcohol.  A.R. at 445.  Pinnick also received an intramuscular injection of Depo-Medrol during the visit.  A.R. at 445.

Pinnick saw Dr. Wasserman again on April 7, 2011 and reported pain and swelling in both knees, hands, feet, and elbows.  A.R. at 447.  He described the pain as daily and constant rather than episodic.  A.R. at 447.  Pinnick reported Allopurinol and colchicine had been helpful and denied adverse effects from those mediations.  A.R. at 447.  The musculoskeletal examination during this visit found normal gait without assistive devices; normal upper extremities with the exception of a decreased range of motion in both shoulders; and normal lower extremities with the exception of a hallux valgus deformity in the right first MTP joint.  A.R. at 447-48.  Dr. Wasserman noted that the cause of some of Pinnick's joint pain may not have been gout and issued a referral for physical therapy.  A.R. at 448.  Pinnick's neurological

examination showed his sensation, coordination, strength, and reflexes were normal.  A.R. at
448.  Dr. Wasserman did not change Pinnick's prescribed medications from his previous visit,
counselled him to avoid dietary triggers, including alcohol.  A.R. at 448-49.

Pinnick's had another appointment with Dr. Wasserman on September 14, 2011, and he
continued to report pain in both knees, hands, feet, and elbows, but denied numbness, significant
swelling, and gouty flare.  A.R. at 451.  Pinnick's musculoskeletal examination revealed normal
gait without assistive devices; normal upper extremities with the exception of a decreased range
of motion in both shoulders; and normal lower extremities with the exception of the hallux
valgus deformity on his right foot.  A.R. at 451-52.  Pinnick's neurological examination showed
his sensation, coordination, strength, and reflexes were normal.  A.R. at 452.  Dr. Wasserman
advised Pinnick to continue taking Allopurinol and colchicine.  A.R. at 452.  Pinnick was also
given Lidocaine to apply topically and was encouraged to pursue physical therapy.  A.R. at 452-
53.

Pinnick attended physical therapy from September 16, 2011 through January 23, 2012.
See A.R. at 460-515.  Pinnick reported improvement throughout this time period and his
improvement was noted in the assessments completed by his physical therapists.  See, e.g., A.R.
at 468, 485, 497, 506.  For example in the notes from his December 7, 2011 appointment,
Pinnick's physical therapist noted that he "has increased [range of motion], decreased pain
levels, improved tolerance to ambulation with [a] cane, and improved strength."  A.R. at 499.

On November 4, 2011, Pinnick was seen by Stephanie Yesner, a registered nurse, for a
new patient appointment and to refill his medication.  A.R. at 547.  During this appointment,
Pinnick was noted to have reduced mobility, was walking with a cane, and winced during
changes in position.  A.R. at 549.

On December 2, 2011 Pinnick had a new patient visit with Lisa Schwartz, a nurse practitioner.  A.R. at 539.  At that time, he reported lower back pain, sciatica, and gout, but noted that his gout was well controlled.  A.R. at 539.  Pinnick also revealed that he had not taken pain medication in six months because of his inability to see his doctor for a refill.  A.R. at 539, 543.  Schwartz's examination of Pinnick revealed a decreased range of motion in his spine during active flexion, extension, abduction, and adduction but no muscle spasms at L4-L5, no tenderness of the lower back, and a negative straight leg raise.  A.R. at 542.  Additionally, Pinnick's neurological system was functioning normally.  A.R. at 542.  Pinnick requested Percocet to control his lower back pain, which Schwartz did not prescribe at that time, and declined Ibuprofen when offered.  A.R. at 543.

On December 14, 2011, Pinnick was seen by Dr. Wasserman due to pain and swelling in his both hands and continued diffuse pain.  A.R. at 455.  Pinnick denied flares of acute gout and reported participating in physical therapy two times per week.  A.R. at 455.  A musculoskeletal examination showed Pinnick to have tenderness in his PIP and metacarpophalangeal joints, decreased range of motion in both shoulders with tenderness to palpation, but no deformity or synovitis in his upper extremities.  A.R. at 455.  The exam also revealed normal lower extremities with the exception of the hallux valgus deformity on his right foot; and normal gait with the use of a cane.  A.R. at 455.  Dr. Wasserman included in her notes that Pinnick's chronic arthralgias appeared not to be associated with his acute gout flares and that his chronic pain may be related to a lowered pain threshold and history of substance abuse.  A.R. at 456.  The neurological examination found Pinnick's sensation, coordination, strength, and reflexes to be normal.  A.R. at 455.  Pinnick's medication remained unchanged from his September 14, 2011

visit and was given a referral for x-ray imaging to further evaluate his hands for bone pathology. A.R. at 456-57.

On January 26, 2012, Pinnick was seen by Schwartz for a follow-up visit and to refill his medication. A.R. at 522. Pinnick stated that he had stopped going to physical therapy because of increased pain. A.R. at 522. A physical examination reduced mobility and paraspinal tenderness. A.R. at 523. Pinnick was also found to have a normal neurological function. A.R. at 523. Pinnick was prescribed Tylenol with Codeine #3, Flexeril, and Clinoril but declined Ibuprofen and Naprosyn. A.R. at 524. Additionally, Schwartz referred Pinnick for rehabilitation due to his back pain. A.R. at 524.[3]

Pinnick returned to be examined by Schwartz on January 10, 2013. A.R. at 641. Schwartz's notes mention Pinnick's throbbing, chronic pain that was exacerbated by walking and climbing stairs, radiating sharp numbness down both legs and his upper left extremity, and difficulty lifting more than 30 pounds. A.R. at 641. Pinnick did not want narcotics for his back pain. A.R. at 641. Upon examination, Schwartz found no spinal tenderness but spasms throughout. A.R. at 644. The exam additionally found Pinnick to have slight weakness of the lower left extremity but intact motor function and sensation, normal gait and station, normal deep tendon reflex, and no swelling in the lower extremities. A.R. at 644. Pinnick was prescribed Naprosyn, Flexeril, and Allopurinol. A.R. at 646-47.

On February 11, 2013, Pinnick presented in the clinic with a cough and scratchy throat. A.R. at 634. He also complained of back pain and requested and received a new cane, reporting that he had lost his previous one. A.R. at 634.

---

[3] There is a gap in Pinnick's medical records from March through November of 2012. The administrative record indicates Pinnick was incarcerated from February 23, 2012 through December 19, 2012. A.R. at 24-25, 208. It appears, however, Pinnick was treated for chest pain in the emergency room on June 28, 2012. A.R. at 655.

Pinnick began seeing Dr. Julien Dedier on February 26, 2013. A.R. at 628. Dr. Dedier's examination revealed Pinnick to have a non-deformed spine; a negative straight leg raise; normal gait and station; but a decreased range of motion of his spine in all planes, especially during flexion and extension. A.R. at 629. Pinnick informed Dr. Dedier that physical therapy had helped with his back pain and sciatica. A.R. at 628. Pinnick was prescribed Ibuprofen for pain and Flexeril for muscle spasms. A.R. at 630-31.

Pinnick then started physical therapy again in March of 2013. A.R. at 607-09. On March 28, 2013, Pinnick's physical therapist noted observing "improvement in symptoms" and that Pinnick was "progressing well at this time." A.R. at 596. Pinnick also stated at the same visit that he was managing his existing pain. A.R. at 595. Over, the next two months, the physical therapist continued to evaluate and record improvement. A.R. at 574, 581. At Pinnick's April 30, 2013 appointment, he insisted that there was a temporary improvement in his system, therapy was helping, and that he wished to continue. A.R. at 571-72.

On April 12, 2013, Pinnick received a MRI of his lumbar and cervical spine which showed degenerative joint disease. A.R. at 618-20. The MRI revealed moderate disc bulges, mild spinal canal narrowing, and foraminal narrowing in both the lumbar and cervical spine. A.R. at 618-20.

Pinnick returned to see Dr. Dedier on May 7, 2013 where he found Pinnick had a normal twisting and lateral bending range of motion in his spine, no midline or paraspinal tenderness, a negative straight leg raise, but a slow and methodical gait and reduced range of motion during flexion and extension of his spine. A.R. at 614-615. Pinnick's neurological examination was normal. A.R. at 615. It was also documented that Pinnick had also showed some improvement with physical therapy, but noted that his pain still ranged from eight to ten on a scale of ten.

A.R. at 614, 616.  Pinnick's "individual care plan" from this appointment suggested that he visit a pain clinic.  A.R. at 616.

Pinnick's saw Dr. Dedier again on June 6, 2013 for a follow-up visit.  A.R. at 610.  It was noted that his back pain had improved with physical therapy but that he was suffering from neck pain and headaches.  A.R. at 610.  Dr. Dedier's examination revealed heat and intermittent numbness in Pinnick's upper left extremity.  A.R. at 611.  Pinnick's gait, station, and neurological function were noted to be normal.  A.R. at 612.  Dr. Dedier prescribed Nabumetone for pain.  A.R. at 613.  Dr. Dedier noted that Pinnick had not yet made an appointment with a pain clinic, as suggested during the prior appointment.  A.R. at 612.

On June 12, 2013, Dr. Dedier completed a "Physical Residual Functional Capacity Questionnaire."  On the questionnaire, Dr. Dedier opined that Pinnick was limited to standing or walking for two hours per day and sitting for four hour per day.  A.R. at 661.  Dr. Dedier also responded that Pinnick would need unscheduled breaks every thirty to forty minutes, could lift twenty pounds occaisionaly and ten pounds frequently, and that Pinnick's conditions would cause him to be absent from work about twice per month.  A.R. at 661-62.

D.     Pinnick's Hearing

At the hearing before the ALJ, Pinnick testified that he passed the time during the day by watching "a little bit of TV," although he has to reposition himself every forty-five minutes to an hour to avoid pain and discomfort.  A.R. at 33-34.  Pinnick further testified at the hearing that he does not trust himself to drive anymore, uses public transportation to get around, and tries to limit walking.  A.R. at 36.  Additionally, Pinnick testified that his balance was fair, that he could lift a gallon of milk for a certain amount of time, crawl "military style" for a short distance, and walk two blocks.  A.R. at 35.  However, Pinnick testified he could not pick up his grandchild

weighing between twenty-five and thirty pounds, crouch down, or bend at the waist.  A.R. at 35.

With regard to the Pinnick's pain, he testified that on a scale of one to ten, on a typical day his

pain is a six or six and a half, and at least once per week his pain is an eight.  A.R. at 38-39.

The ALJ then posed a hypothetical question to the vocational expert regarding the

employability of

> an individual who has the same age, education and work history as the
> Claimant who is able to lift 20 pounds occasionally, 10 pounds frequently,
> stand or walk at least six hours in an eight-hour day and sit with normal
> breaks about six hours in an eight-hour day.  Please further assume that
> this individual has the ability to occasionally climb, balance, stoop, kneel,
> crouch or crawl.  They have occasional ability to push and pull with both
> upper extremities.
>
> They must avoid concentrated exposure to extreme cold, to wetness and
> all hazards in their work environment.  Lastly, assume that this individual
> is work is limited to only occasional interaction with the public, coworkers
> and supervisors, and to the performance of simple, routine and repetitive
> instructions.

A.R. at 42.  The vocational expert testified that such an individual would not be able to

perform Pinnick's past work but that light, unskilled jobs could be performed by someone

with Pinnick's restrictions and abilities.  A.R. at 42-43.  The vocational expert offered

photocopy operator, wire worker, and inspector as examples of such jobs.  A.R. at 43.

The vocational expert then testified in response to a second hypothetical question

posed by the ALJ that if a person with the restrictions described above were to have three

unexcused absences per month, that would render such a person unemployable for the

suggested jobs.  A.R. at 43.  Pinnick then inquired of the vocational expert whether "two

days [of unexcused absences] per month [would] be tolerated?"  A.R. at 44.  The

vocational expert answered that such a rate of absenteeism would not be tolerated.  A.R.

at 44.

E.      The Administrative Decision

As an initial matter, the ALJ found that Pinnick met the insured status requirement for the purpose of DIB through December 31, 2013.  A.R. at 16.  The ALJ then completed the five-step analysis to evaluate Pinnick's claims for benefits.[4]  A.R. at 16-22.  At the first step, the ALJ found that Pinnick had not engaged in substantial gainful activity since September 1, 2011, the amended alleged onset date.  A.R. at 16.  At the second step, the ALJ found that Pinnick has the following severe impairments that cause significant limitation of his ability to perform basic work activities: degenerative disc disease, gout, and depressive disorder.  A.R. at 16.  At the third step of the analysis, the ALJ determined that Pinnick "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments."  A.R. at 17.  The ALJ then determined that Pinnick "has the residual functional capacity to perform light work . . . except that [Pinnick] has the ability to occasionally climb, balance, stoop, kneel, crouch or crawl, is able to occasionally push and pull with both upper

---

[4] The five requisite steps of analysis are:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.

> Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits his or her physical or mental capacity to perform basic work-related functions." If the claimant does not have an impairment of at least this degree of severity, he is automatically considered not disabled.

> Third, does the claimant have an impairment equivalent to a specific list of impairments contained in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled. . . .

> Fourth, does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

> Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so, he is disabled; if not, he is not disabled.

Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982) (Breyer, J.).

extremities, must avoid concentrated exposure to cold, wetness and all hazards in the work environment." A.R. at 18. The ALJ found that Pinnick "is limited to only occasional interaction with the public, coworkers, and supervisors and is limited to the performance of simple, routine, repetitive instructions." A.R. at 18.

Considering his residual functional capacity, the ALJ found, at the fourth step, that Pinnick could not perform his past relevant work as a carpenter. A.R. at 21. At the fifth step, the ALJ determined that there were jobs existing in significant numbers that Pinnick could perform, including photocopy machine operator, wire worker, and inspector. A.R. at 21-22. Thus, the ALJ found Pinnick not to be disabled. A.R. at 22.

In arriving at Pinnick's residual functional capacity, the ALJ found Pinnick's testimony to be not entirely credible. A.R. at 20. He found Pinnick's description of the severity of his symptoms to be inconsistent with the medical evidence in the record. A.R. at 20. The ALJ also pointed to the fact that Pinnick's treatment was limited and that Pinnick was not fully compliant with treatment. A.R. at 20.

In addition, as part of determining Pinnick's residual functional capacity, the ALJ granted great weight to the State agency non-examining consultants and little weight to the opinion of Dr. Dedier, Pinnick's primary care provider. Specifically, the ALJ

> grant[ed] little weight to the opinion of Dr. Dedier because it is inconsistent with the record as a whole. Specifically, it is inconsistent with the claimant's ability to go shopping, drive and watch movies. Further, it is inconsistent [with] physical exam findings generally indicating normal gait and station and normal neurological findings. I grant great weight to the opinions of State agency nonexamining consultants, because they are generally consistent with the substantial evidence of record and the longitudinal treatment record.

A.R. at 21.

## II.     STANDARD OF REVIEW

The Court's jurisdiction is limited to reviewing the administrative record to determine whether the ALJ applied the proper legal standards and whether the decision is supported by substantial evidence in the record.  42 U.S.C. § 405(g); <u>Manso-Pizarro v. Sec'y of Health & Human Servs.</u>, 76 F.3d 15, 16 (1st Cir. 1996) (per curiam).  Substantial evidence is such relevant evidence as a reasonable mind, reviewing the evidence in the record as a whole, could accept as adequate to support a conclusion.  <u>Rodriguez v. Sec'y of Health & Human Servs.</u>, 647 F.2d 218, 222 (1st Cir. 1981).  Determinations of credibility and the resolution of conflicts in the evidence are for the Commissioner and not for the doctors or for courts.  <u>Id.</u>; <u>see</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 399 (1971).

Administrative findings of fact are not conclusive, however, "when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts."  <u>Nguyen v. Chater</u>, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).  If the Court finds that the Commissioner's decision is based on legal error or is not supported by substantial evidence, it has the power to modify or reverse the Commissioner's decision, with or without remanding for rehearing.  42 U.S.C. § 405(g).

III.    <u>DISCUSSION</u>

Pinnick complains that the ALJ's decision to give little weight to Dr. Dedier's opinion and great weight to the State agency non-examining consultants lacked substantial evidence. Doc. No. 18-1 at 5-6.  Pinnick also claims that the ALJ improperly ignored the vocational expert's testimony that there would be no jobs available for someone with Pinnick's restrictions and abilities who missed two days of work per month.  Doc. No. 18-1 at 6.

Controlling weight will be granted to the opinion of the treating physician when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  When determining what weight to assign to a medical opinion that is not given controlling weight, the ALJ considers the following factors in determining the weight to give the opinion:  the examining relationship, the length of the treatment relationship and frequency of examination, the nature and extent of the treatment relationship, the amount of relevant evidence to support the medical opinion, the consistency of the medical opinion with the record as a whole, and whether the physician is a specialist and their opinion raises medical issues related to his or her area of specialty.[5]  Id. §§ 404.1527(c), 416.927(c).  The ALJ is not obligated to discuss each factor in his decision of the weight to give a treating physician's testimony, so long as they give good reasons supported by the evidence in the record.  See id. §§ 404.1527(c)(2), 416.927(c)(2); see also Alberts v. Astrue, No. 11–11139–DJC, 2013 WL 1331110, at *8 (D. Mass. Mar. 29, 2013); Braley v. Barnhart, No. 04–176–B–W, 2005 WL 1353371, at *4 (D. Me. June 7, 2005) (noting a lack of authority for the proposition that "an [ALJ] must slavishly discuss each of these factors for his consideration of a treating-source opinion to pass muster").

Here, the ALJ implicitly declined to give Dr. Dedier's opinion controlling weight and explained that he, in fact, assigned little weight to Dr. Dedier's opinion because his opinion was inconsistent with the record as a whole, specifically citing to Pinnick's daily activities and the physical exam findings generally indicating normal gait, station, and neurological function.  A.R. at 21.  Pinnick argues that the ALJ's decision to grant little weight to Dr. Dedier opinion regarding non-exertional impairments was not supported by substantial evidence and amounted to substituting his lay opinion for the opinion of Dr. Dedier.  See Doc. No. 18-1 at 6.

---

[5] The ALJ also considers any factors brought to their attention or of which they are aware that tend to support or contradict the opinion.  20 C.F.R. § 404.1527(c).

The ALJ's assignment of weight to the medical opinions is supported by substantial evidence in the record.  An ALJ "may choose not to give [the opinion of the treating source] controlling weight if the hearing officer finds that it is inconsistent with other substantial evidence in the record," Green v. Astrue, 588 F. Supp. 2d 147, 154 (D. Mass. 2008), which is exactly what happened here.  Further, the ALJ provided good reasons for his decision to assign little weight to Dr. Dedier's opinion.  See id. (citing 20 C.F.R. § 404.1527(d)(2)).

Several aspects of the medical records provide substantial evidence for the conclusion that Pinnick was not as limited as Dr. Dedier opined.  First, Pinnick's musculoskeletal examinations were normal overall, notably revealing normal gait.  See A.R. at 447-48, 451-52, 455, 644.  Dr. Wasserman consistently found Pinnick to have normal gait.  A.R. at 447-48, 451-52, and 455.  Pinnick's January 10, 2013 examination by Schwartz also revealed normal gait and station, as did a February 2013 examination by Dr. Dedier.  A.R. at 629, 644.  Furthermore, both Schwartz and Dr. Dedier found Pinnick to have a negative straight leg raise.  A.R. at 542, 614-15, 629.  Second, Pinnick's medical records note that Pinnick's gout was "well-controlled" based on Dr. Wasserman's examinations.  A.R. at 539.  Third, Pinnick's neurological examinations, completed by Dr. Wasserman, Dr. Dedier, and Schwartz, were generally normal.  See A.R. at 448, 451-52, 455, 523, 611-612, 615.  In particular, the neurological examinations revealed normal sensation, coordination, strength, and reflexes.  See A.R. at 448, 451-52, 455.  Finally, Pinnick regularly reported improvement in pain due to physical therapy and use of medication. See A.R. at 444, 447, 460-515, 543, 571-72, 574, 581, 595-96, 616, 628.

Although the ALJ only specifically mentioned inconsistency with the record as a reason to give less weight to Dr. Dedier's testimony, elsewhere in his opinion he notes that Dr. Dedier is Pinnick's primary care physician and not a specialist, and that Pinnick first began seeing Dr.

Dedier in February of 2013.  A.R. at 19.  Thus, the totality of the record provides substantial

evidence supporting the ALJ's decision to assign less weight to Dr. Dedier's opinion,

particularly his opinion that Pinnick was limited in his ability to stand, walk and sit.  See Conte

v. McMahon, 472 F. Supp. 2d 39, 48 (D. Mass. 2007) (affirming decision of commissioner

where hearing officer only mentioned inconsistency of the record as the basis to grant diminished

weight to treating source's opinion); see also Alberts, 2013 WL 1331110, at *8-9.

      Pinnick also argues that by granting little weight to Dr. Dedier's opinion on the basis of

Pinnick's stated ability to go shopping, drive, and watch movies, the ALJ substituted his own

opinion for that of a medical doctor.  Doc. No. 18-1 at 5.  Specifically, Pinnick argues that the

ALJ rejected Dr. Didier's findings without citing to any contrary medical evidence.  Doc. No.

18-1 at 5.  In fact, the ALJ's decision referred to Dr. Didier's opinion as being inconsistent with

"the record as a whole" and cited, in addition to his daily activities, the physical exam findings

contained in the record.  A.R. at 21.  The ALJ also referenced the opinions of the state agency

consulting physicians who found that Pinnick's "condition results in some limitations in [his]

ability to perform work related activities . . . [but] is not severe enough to keep [him] from

working."  A.R. at 98.  In short, the ALJ's assignment of weight to the medical opinions is

supported by substantial evidence and was not a result of the ALJ "substitute[ing] h[is] own

opinions of an individual's health for uncontroverted medical evidence."  Nieves v. Sec'y of

Health & Human Servs., 775 F.2d 12, 14 (1st Cir. 1985); see Berrios Lopez v. Sec'y of Health

and Human Servs., 951 F.2d 427, 429-32 (1st Cir. 1991) (per curiam) (holding that the reports of

non-testifying, non-treating physicians can constitute substantial evidence supporting a finding

of a claimant's residual functional capacity).

In addition, it bears noting that the portions of Dr. Dedier's opinion that Pinnick specifically cites—that he could miss up to two days a month of work and that because of his pain he could experience both good days and bad days—were both mentioned as part of a "Residual Functioning Questionnaire." Doc. No. 18-1 at 5; A.R. at 660-63. The governing regulations provide that more weight will be accorded to the opinion of a treating source that provides an explanation for her opinion. 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3); see also Berrios Lopez, 951 F.2d at 431 (noting that reports of non-testifying, non-examining physicians "often contain little more than brief conclusory statements or the mere checking of boxes denoting levels of residual functional capacity, and accordingly are entitled to relatively little weight."). Dr. Dedier provided little to no explanation of his check-the-box conclusions in the Residual Functioning Questionnaire. See A.R. at 660-62. When considering opinions in the form of residual functioning questionnaires, other sessions of this court have found that such forms "are entitled to little weight in the evaluation of disability." See Lacroix v. Barnhart, 352 F. Supp. 2d 100, 112 (D. Mass. 2005) (quoting Anderson v. Sec'y of Human Servs., 634 F. Supp. 967, 972 (D. Mass. 1984)).

Lastly, Pinnick claims that the ALJ erred by ignoring the vocational expert's testimony that two unexcused absences per month would result in no available work for Pinnick. Doc. No. 18-1 at 6. At the hearing, the ALJ posed two separate hypothetical questions to the vocational expert, one of which inquired about the effect of three or more unexcused per month absences. A.R. at 42-43. Pinnick posed a third question to the vocational expert which inquired about the effect of only two unexcused absences per month. A.R. at 44-45. The ALJ found that Pinnick's residual functional capacity did not restrict his ability to report regularly to his work. A.R. at 18. Accordingly, the ALJ was entitled to rely on the answer to the hypothetical that accorded with

Pinnick's residual functional capacity as he found it to be.  See Arocho v. Sec'y of Health &

Human Servs., 670 F.2d 374, 375 (1st Cir.1982) ("[I]n order for a vocational expert's answer to

a hypothetical question to be relevant, the inputs into that hypothetical must correspond to

conclusions that are supported by the outputs from the medical authorities."); Freitas v. Astrue,

Civ. A. No. 10-10594-DJC, 2011 WL 2791039, at *10 (D. Mass. July 18, 2011).  Thus, the ALJ

did not ignore relevant evidence, but rather decided, properly, not to rely on testimony that did

not comport with Pinnick's residual functional capacity as he found it to be.

IV.     CONCLUSION

        For the reasons set forth above, the Court ALLOWS the Commissioner's Motion to

Affirm (Doc. No. 26) and DENIES Pinnick's Motion to Reverse (Doc. No. 18).

                                        SO ORDERED.

                                         /s/ Leo T. Sorokin
                                        Leo T. Sorokin
                                        United States District Judge